J-S69044-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: V.R.C., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.C., NATURAL MOTHER | : : : : : : | |
| | : | No. 1096 WDA 2017 |

Appeal from the Decree July 3, 2017
in the Court of Common Pleas of Erie County Orphans' Court at No(s):
22 in Adoption 2017

BEFORE:   BOWES, J., RANSOM, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                FILED DECEMBER 13, 2017

Appellant, J.C. ("Mother"), files this appeal from the decree dated June 28, 2017, and entered July 3, 2017, in the Erie County Court of Common Pleas, granting the petition of Erie County Office of Children and Youth ("OCY") and involuntarily terminating her parental rights to her minor, dependent daughter, V.R.C. ("Child"), born in March 2015, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  After review, we affirm the trial court's decree.

_____

* Former Justice specially assigned to the Superior Court.

[1] Child's father, J.R. ("Father"), signed a voluntary consent to adoption on March 1, 2017.  Petition to Confirm Consent to Adoption, 3/8/17.  The court confirmed Father's consent to adoption, and Father's parental rights were terminated by decree dated April 12, 2017, and entered April 17, 2017. Decree, 4/17/17.

The trial court summarized the relevant procedural and factual history as follows:

> . . .The Child, along with her three siblings, was adjudicated dependent on February 23, 2016.[2]  The Child is the youngest of the four siblings.  . . .The Child that is the subject of this appeal remains in foster care, initially with a permanency goal of reunification while [OCY] worked to identify her biological father, then later with a permanency goal of adoption, after her biological father was identified and elected to voluntarily relinquish his parental rights.
>
> The Dependency Petition alleges that the Child was without proper care or control and therefore dependent based on the following stipulated facts, as amended:
>
> > 1(a) It is averred that [Mother] has an extensive history with the Agency due to concerns regarding physical abuse, sexual abuse, poor home conditions, failure to follow through with services and being uncooperative with the Agency.  It is averred that the Mother [] is not an indicated or founded perpetrator of abuse; and
> >
> > (b) It is averred that [Mother] has multiple pending criminal charges including arson-danger of death or bodily injury, arson-intent to collect insurance, risking catastrophe, recklessly endangering another person, false/fraud/incomplete insurance claim, and insurance/intent to defraud.
>
> Based upon the above findings, Mother, who has been represented by legal counsel throughout these proceedings, stipulated to the adjudication of dependency for the Child. However, OCY essentially argues that[,] since the adjudication hearing, Mother has conducted herself as though paragraph 1(a) does not apply.  That is to say, she has refused to participate in court-ordered services, particularly mental health evaluation services and parenting classes, asserting she has no mental health diagnosis, and no need for parenting classes.  By her refusal to

_____

[2] Upon review of the docket, this order was not entered until March 1, 2016. Petitioner's Exhibit 2 at 4.

cooperate, and due to her incarceration, OCY argues Mother has deprived herself and the Child of timely reunification.

According to Juvenile Dependency Court Summaries and Orders, all of which were admitted into evidence without limitation or objection at the IVT [involuntary termination] trial, a dispositional hearing was held on March 21, 2016. The Court Summary for that date notes that Mother was incarcerated and the biological [f]ather was unknown. It appears the man listed as father on the Child's birth certificate, J.W., was incarcerated at all times near the date of conception, and would undergo paternity testing. The Court Summary also notes that J.W. is an indicated perpetrator of sexual assault in 2010. In the same year, he pled no contest to a charge of corruption of minors. The Child's Permanency Plan attached to the Court Summary, reveals that OCY recommended a complete mental health assessment for Mother while incarcerated, but Mother refused to sign the permanency plan. After the hearing, an Order dated March 23, 2016, was entered requiring Mother to complete a mental health assessment while incarcerated, and participate in any rehabilitative and parenting classes available while incarcerated. A follow-up permanency review hearing was scheduled for June 29, 2016, then rescheduled for July 26, 2016.

According to the Court Summary for the July 26, 2016 hearing, which bears the original June 29, 2016[] hearing date, the caseworker met with Mother at the Erie County Prison in April of 2016. Mother reported to the caseworker that she did not require mental health services, or parenting or rehabilitation classes, and she declined a mental health assessment. After the review hearing, which Mother attended represented by counsel, this [c]ourt found there had been no compliance with the permanency plan by Mother, and no progress toward alleviating the circumstances that necessitated the original placement. The resulting Order continued the goal of reunification and requirement of a mental health evaluation, and rehabilitation and parenting classes. Notably, there is no evidence that Mother was desirous of pursuing the permanency plan, but having difficulty doing so for reasons beyond her control, as she now argues. The material statements in the Court Summary were corroborated by OCY caseworker testimony at the IVT trial.

The next review hearing was scheduled for October 7, 2016, then rescheduled to November 21, 2016. Mother was in attendance with her legal counsel. During this review period,

- 3 -

Mother had been briefly released from incarceration on August 15, 2016. The criminal trial on her arson-related charges occurred in the latter part of September. She was found guilty on all charges, and re-incarcerated by Order dated September 23, 2016. During her brief release, the OCY caseworker met with Mother and the three older siblings on September 8, 2017 to discuss the family's treatment plans. A visit with the Mother and Child was to occur separately. According to the Court Summary, which bears the original October 7, 2016[] hearing date, the September 8, 2016 visit did not go well. Mother did not use the time to connect with her children, or address progression through the permanency plan. Instead, she engaged the older siblings in inappropriate discussions about the merits of their respective fathers, and her upcoming criminal trial. She was found using one of the sibling's mobile phones to research her criminal charges and access social media. She refused to sign a new treatment plan adapted for her release from prison, and continued to deny the need for OCY services. Due to Mother's failure or inability to appropriately engage with her children, the caseworker canceled the next visit, and elected not to schedule a separate visit for Mother and the Child. The material statements in the Court Summary were corroborated by caseworker testimony at the IVT trial.

Shortly after the September 8, 2016[] meeting with the older siblings, the criminal trial occurred. Mother was convicted on all charges and re-incarcerated, where she remains to date. During this review period, OCY continued its efforts to identify the Child's biological father. Another person, J.R., was identified for paternity testing, and an older sibling's father, C.H., was excluded through paternity testing.

At the November 21, 2017[] permanency review hearing[,] it was brought to the [c]ourt's attention that the Child's kinship caregivers, friends of the family, were no longer willing to serve as an adoptive resource for the Child. By January 25, 2017, the Child was placed in the pre-adoptive home where she remains to date. Paternity testing established that J.R. was in fact the Child's biological father. J.R. communicated his desire to voluntarily relinquish his parental rights, and by Order dated February 15, 2017, the Child's permanency goal was changed to adoption.[3]

_____

[3] Upon review of the docket, this order was not entered until February 16, 2016. Petitioner's Exhibit 2 at 10.

The next review hearing occurred May 5, 2017. At that time, Mother remained incarcerated, and father's parental rights were terminated by voluntary relinquishment Order dated April 12, 2017. The Court Summary for this review period indicates that the OCY caseworker made contact with Mother on March 8, 2017 to discuss the Child's permanency goal change to adoption, and though Mother disagreed with the decision, she also indicated she would not participate in the OCY treatment plan for the Child upon her eventual release from prison. Regarding Mother's ability to articulate an understanding of how her actions have impacted her children, which is a routine requirement in most permanency plans, the caseworker made the following note, corroborated by her testimony at the IVT trial:

> [Mother] denies any issues with her parenting and projects blame onto others for the current situation. Specifically, [Mother] reported that prior to her incarceration, there were no issues with her parenting as there were no abuse allegations. She reported that her children were always taken care of in her care. She does not take responsibility for being incarcerated and stated that she was wrongfully convicted and that she is innocent. Further, [Mother] threatened to sue the agency for violating her constitutional rights by terminating her parental rights and ripping her family apart. She also reported to this worker that upon her release from incarceration, she will go to the court house to file a motion to get all four of her children back into her care. She also alleges that all four children are not getting their needs met in their placements and that the children who have been closed by the agency should be re-opened. She stated that her children may not have physical harm done to them, but that they have internal cigarette burns and psychological damage done to them by being in placement. [Mother] continues to have no change in her thoughts of having responsibility for her children's placement.

Mother's conception of a stable, healthy home, ripped apart by the injustice of the criminal and dependency court systems is belied by the evidence in this case. . . .

Trial Court Opinion ("T.C.O."), 8/11/17, at 1-5 (citations to record omitted)

OCY filed a petition to terminate parental rights on May 16, 2017. The trial court held a hearing on June 22, 2017. In support thereof, OCY presented the testimony of Jamie Sansone, OCY intake specialist and former caseworker; and Stephanie Mumford, OCY caseworker. OCY further offered Exhibits 1 through 9, which were admitted without objection. Notes of Testimony ("N.T."), 6/22/17, at 6. In addition, Mother, who was present and represented by counsel, testified on her own behalf.[4]

By decree dated and entered June 28, 2017, the trial court involuntarily terminated the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On July 21, 2017, Mother, through appointed counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

1.      Did the orphans' court commit an abuse of discretion and/or error of law when it concluded that the agency had established, by clear and convincing evidence, the grounds for termination under 23 Pa.C.S.A. §[] 2511(a)(1),(2),(5), and (8), where Appellant established her release date from incarceration, established that services were unavailable to her, and where no

_____

[4] The Guardian Ad Litem, Catherine Allgeier, Esquire, after requesting and being granted permission to serve as Counsel for Child, noting Child's young age and a lack of conflict between Child's legal and best interests, also participated in the proceeding. N.T. at 3. At the close of the hearing, Ms. Allgeier argued in favor of termination of Mother's parental rights. Id. at 57-58. While Ms. Allgeier sent a letter dated October 9, 2017, and filed October 11, 2017, referencing the comprehensive trial court opinion and noting her joinder in OCY's brief, we observe that OCY did not file a brief. Letter, 10/11/17.

assessment of the bond between Child and Mother was completed?

2.      Did the orphans' court commit an abuse of discretion and/or error or law when it concluded that the termination of [J.C.]'s parental rights was in the child's best interests under 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 6 (unnecessary capitalization omitted).[5]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., [47 A.3d 817, 826 (Pa. 2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., [9 A.3d 1179, 1190 (Pa. 2010)].

In re T.S.M., 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free

---

[5] We observe that Mother states her issues somewhat differently than in her Rule 1925(b) statement filed with her notice of appeal, but find that she has preserved all issues. Despite being stated broadly and without reference to Section 2511(a) and (b) in her Rule 1925(b) statement, we determine that Mother was challenging the sufficiency of evidence of grounds for termination under Section 2511(a) and (b). See Commonwealth v. Laboy, 936 A.2d 1058, 1060 (Pa. 2007) (holding that this Court erred in determining that the appellant had failed to adequately develop, in his Rule 1925(b) statement, the claim that the evidence was insufficient to support his conviction).

to make all credibility determinations and resolve conflicts in the evidence."

In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

"[I]f competent evidence supports the trial court's findings, we will affirm even

if the record could also support the opposite result." In re Adoption of

T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the

Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis

of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have

defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." In re

C.S., 761 A.2d 1197, 1201 (Pa.Super. 2000) (en banc) (quoting Matter of

Adoption of Charles E.D.M., II, 708 A.2d 88, 91 (Pa. 1998)).

In the case sub judice, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). See In re B.L.W., 843 A.2d 380, 384 (Pa.Super. 2004) (en banc). Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.   To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  In re Adoption of C.D.R., 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting In re A.L.D., 797 A.2d 326, 337 (Pa.Super. 2002)).  "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . .  [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous."  In re A.L.D., 797 A.2d at 340 (internal quotation marks and citations omitted).

In In re Adoption of S.P., supra, our Supreme Court, in addressing Section 2511(a)(2), concluded that

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without

essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

Id., 47 A.3d at 828; see also In re D.C.D., 105 A.3d 662, 675 (Pa. 2014) (holding that incarceration prior to the child's birth and until the child was at least age seven renders family reunification an unrealistic goal and the court was within its discretion to terminate parental rights "notwithstanding the agency's failure" to follow court's initial directive that reunification efforts be made). The Court in S.P. further stated,

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2). See e.g. Adoption of J.J., 515 A.2d [883, 891 (Pa. 1986)] ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [In re] E.A.P., 944 A.2d [79, 85 (Pa.Super. 2008)](holding termination under § 2511(a)(2) was supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).

In re Adoption of S.P., 47 A.3d at 830 (footnote omitted).

In the instant matter, in finding the evidence supported grounds for termination pursuant to Section 2511(a)(2), the trial court concluded as follows:[6]

> As noted above, Mother has been incarcerated since shortly before the Child's adjudication in February 2016, except for a brief release in August of 2016, during which she had no contact with the Child. On November 3, 2016, she was convicted of several arson-related charges, including reckless endangerment, risking catastrophe, and insurance fraud.[7] Appeal of those convictions is pending. Neither party presented evidence, credible or otherwise, of when Mother will be release from prison. Mother asserted that her earliest release date is November 9, 2017, but admitted she has no specific information regarding an actual release date. OCY argued that Mother's release may be delayed due to a subsequent conviction for welfare fraud, and two instances of misconduct during incarceration. Thus, to the extent Mother asserts that the [c]ourt ignored "credible evidence" pertaining to a certain, or even fairly certain, release date, that assertion is inaccurate.
>
> Further, even if all agreed Mother will be released on or near her minimum sentence date, there is no evidence to suggest she would then cooperate with OCY and engage in court-ordered service[]s for the benefit of the Child. Mother has never admitted the need for court-ordered services, even though there is substantial evidence that the services ordered, especially a complete mental health evaluation, are necessary to any plan that would reunify her with the Child. As of the date of the goal change

_____

[6] The court does not frame its discussion in terms of Section 2511(a)(2), but rather in terms of Mother's release from incarceration and participation in reunification services, as Mother did in her Rule 1925(b) statement. Given that we interpret Mother's first two issues raised in her Rule 1925(b) statement as to release from incarceration and participation in reunification services as challenges, in part, to grounds for termination under Section 2511(a)(2), we interpret the court's analysis of these issues as such.

[7] A review of criminal docket reveals that Mother was found guilty on September 21, 2016 and sentenced on November 3, 2016. Petitioner's Exhibit 7.

Order in February of 2017, Mother has done <u>nothing</u> to further the permanency plans, not because, as she states in her second error on appeal, the circumstances of her incarceration prevented her from doing so, but solely because she denies the need for services. Through her own testimony at the IVT trial, and her counsel's cross-examination of OCY witnesses, it was obvious that Mother remains adamant she has no mental health issues and, therefore, would continue to refuse a mental health assessment upon her release from prison.

At the IVT trial, Mother testified she was unable to comply with the permanency requirements due to repeated transfers from facility to facility during incarceration, leaving insufficient time at any one facility to engage in services. The [c]ourt rejects this testimony based on her past refusal to cooperate with OCY; her current testimony inferring that since she has never had a mental health diagnosis she does not require a mental health assessment; the fact that she's been at SCI Cambridge Springs since February of 2017; yet did nothing to pursue the [c]ourt[-] ordered mental health evaluation; and her failure to alert OCY and/or the [c]ourt at any time that she was desirous of pursuing the permanency plan, but being prevented from doing so due to circumstances beyond her control.

. . .

OCY sought termination of parental rights under §§2511(a)(1),(2),(5),(8) and (b) of the Adoption Act, 23 Pa.C.S.A. §§2101-2910. Based upon the evidence summarized above, the [c]ourt found that OCY met its burden of proof by clear and convincing evidence on all grounds. Unfortunately, considering the totality of the circumstances, the [c]ourt is convinced that Mother simply cannot or will not remedy the conditions that led to placement, or meet the developmental, physical and emotional needs and welfare of the Child[] in the foreseeable future. . . .

T.C.O. at 7-8, 10 (emphasis in original).

Mother, however, argues that OCY failed to present sufficient evidence of neglect, incapacity, refusal, or abuse and that the causes thereof cannot or will not be remedied. Mother's Brief at 13-15. Mother states:

[OCY] cannot establish, by clear and convincing evidence, that J.C. cannot or will not remedy the conditions that led to incapacity, abuse, neglect, or refusal. The children came into placement due to Mother's arrest and incarceration, and the alleged mental health issues. [OCY], however, has never been able to identify any actual mental health diagnoses, and therefore that is not a condition that led to placement, as it does not exist. These facts alone are insufficient to establish that the child suffered from neglect, incapacity, or refusal. And they certainly do not amount to abuse. [OCY] is attempting to utilize the Mother's then-pending charges and subsequent incarceration as short-hand for parenting deficiencies. With no other evidence of record to establish these grounds, [OCY] has failed to meet its burden.

Id. at 14-15.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). Significantly, Mother has been incarcerated since Child was committed and placed in February 2016, except for approximately one month when released on bail. N.T. at 9, 11, 19, 38. Mother has not seen or had any contact with Child throughout this entire time. Mother has had no visitation with Child. Id. at 9, 12, 14, 30. Likewise, Mother has sent no cards, letters, or gifts to Child. Id. at 14, 21. While Mother sent correspondence to OCY, former OCY caseworker, Jamie Sansone, characterized this correspondence as rambling. Id. at 21-22. He explained as follows when questioned by counsel for OCY:

Q. And is it safe to say that the purpose of those was asking about the welfare or whereabouts or well-being of her child?

A. No, it's not safe to say that, they kind of rambled.

Q. Okay. And in what way? Can you be a little more specific about why --

- 14 -

> A.    She spoke a lot about her criminal trial, you know, the conditions of the prison. . . .

Id.  Mr. Sansone did acknowledge that Mother asked about her children, and that she requested visitation with Child.[8, 9]  Id. at 22.  Further, as reported by Mr. Sansone and OCY caseworker, Stephanie Mumford, Mother failed to cooperate with any aspect of her treatment plan, denying the necessity of any services,[10] and failed to accept any responsibility for Child's placement.  Id. at 10-11, 13, 16, 30, 32-33; Petitioner's Exhibit 6, Court Summary 5/5/17, at 9, 11-12; Petitioner's Exhibit 6, Court Summary 6/29/16 at 13.  Importantly,

---

[8] Mother testified that she contacted Child's foster parents for pictures or information, but was "ignore[d]."  N.T. at 46.  She did, however, acknowledge receipt of two mailings, including a set of photographs.  Id.  Mother further stated that she begged OCY monthly for information and visitation.  Id.

[9] Mr. Sansone confirmed that visitation with Child was not feasible while Mother was incarcerated in Erie County.  N.T. at 9.  He further testified to his opinion that prison visitation was unsuitable for Child.  Id. at 22, 25.  Notably, as to the brief period during which Mother was not incarcerated and out on bail, Mr. Sansone indicated that Mother's visit with her three older children was inappropriate, and that visitation with Child was not appropriate.  Id. at 12, 13, 22-23; Petitioner's Exhibit 6, Court Summary 10/7/16, at 13.

[10] Mother was required to "complete a mental health assessment while incarcerated and follow any recommendations regarding the use of psychotropic medications, and to participate in any rehabilitative and parenting classes available while incarcerated."  N.T. at 9; see also Petitioner's Exhibit 5, Dispositional Order, 5/23/16.  When released on bail, this plan was amended.  Id. at 19.  Mother refuted the denial of services and blamed her lack of participation on being moved from facility to facility.  Id. at 37, 44-45.  She testified that she was currently taking a parenting class.  Id. at 44-45.

both caseworkers testified to the need for services based on their observations. Id. at 12-13, 27, 34.

Moreover, Mother was sentenced to twenty to forty months' imprisonment. Id. at 14, 43, 53; Petitioner's Exhibit 7 at 4. She testified that her earliest possible or minimum release date is November 9, 2017. Id. at 43-44. However, while Mother completed a victim's awareness class and was currently engaged in a parenting class, she was still on the waiting list for a living safely course which she was required to complete.[11] Id. at 44-45. In addition, Mother admitted to recently pleading guilty to charges stemming from 2012 for welfare fraud. Id. at 53; Petitioner's Exhibit 8 at 2. Further, at the time of the termination hearing, Mother was in solitary confinement for an altercation with another inmate and had prior disciplinary issues while incarcerated in Erie County.[12] Id. at 53-55. More importantly, whenever released, given Mother's attitudes and behaviors, it is speculative whether Mother will then, or ever, be in a position to care for Child. This prospect is simply unacceptable for Child, who was almost two and a half years old and already in the custody of OCY for approximately year and a half at the time of the termination hearing. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to

_____

[11] Mother indicated that these classes were not available to her until her processing and transfer to SCI Cambridge Springs. N.T. at 44-45. She stated that she arrived at Cambridge Springs in February 2017 and started classes in May 2017. Id. at 45.

[12] Mother acknowledged her behavior impacted her release date. N.T. at 54.

assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa.Super. 2006).

Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for their physical and mental well-being. See In re Adoption of M.E.P., 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. See id. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). In re B.L.W., 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa.Super. 2012). In In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.], [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In

re K.M., 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

In re T.S.M., 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

In re Adoption of C.D.R., 111 A.3d at 1219 (quoting In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case sub judice, in determining that termination of Mother's parental rights favors the Child's needs and welfare under Section 2511(b) of the Adoption Act, the trial court reasoned as follows:

Mother argues that the [c]ourt erred by finding that no bond exists between Mother and Child without supporting evidence. Child-parent bond issues are generally considered under the "other considerations" provisions of the IVT statute, at 23 Pa.C.S.A. §2511(b). That section states in pertinent part that in terminating the rights of a parent, the [c]ourt, "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." Our [a]ppellate [c]ourts have construed this provision to require an assessment by the [c]ourt of the effect that severing the parent-child bond would have on the child, under the particular facts of each case[] . . .; and the [c]ourt must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." Additionally, the [c]out must consider the importance of other intangibles, such as continuity of relationships, and whether any existing parent-child bond can be severed without detrimental effects on the child.

. . .[T]his [c]ourt relied upon the particular facts before it to conclude that no parent-child bond exists, and that termination of Mother's parental rights serves the Child's best interests. Specifically, the [c]ourt considered the young age of the Child when she went into placement (10 months[]old);[13] the length of time since the Child had been in the Mother's presence (approximately 18 months, from infancy to toddlerhood); and the credible opinions of the OCY caseworkers and the Child's attorney that the Child is doing well with her pre-adoptive family,[14] and terminating Mother's parental rights to facilitate permanency with the pre-adoptive family is in the Child's best interests. To the extent Mother argues that out law requires an expert opinion, or formal bonding assessment as a matter of course in every case, that argument is rejected. While there are certainly cases where formal assessment is essential, there are many like the case at

_____

[13] There is some disparity in the record as to whether Child came into care at ten or eleven months old. N.T. at 8, 27-28; Petitioner's Exhibit 6, Court Summary 5/5/17, at 4; Petitioner's Exhibit 6, Court Summary 3/21/16, at 7.

[14] Ms. Mumford testified that Child is placed with a pre-adoptive resource to whom Child is bonded and is meeting Child's needs. N.T. at 31. Ms. Mumford further opined that Child would be negatively impacted if removed from this home. Id. at 31-32.

bar, where bonding issues are adequately addressed by those working closely with the [c]hild.

T.C.O. at 8-9 (citations omitted).

Mother, however, takes issue with the failure to conduct a bonding assessment. She avers as follows:

> In this matter[,] it is uncontested that no bonding assessment, even an informal one, was completed. In fact, the initial caseworker indicated that, despite the [c]ourt's established goal of "reunification," he took it upon himself to usurp the [c]ourt's judgment and refrain from a bonding assessment because he felt that the child should not see the Mother. Once again, other than her incarceration, no actual evidence was introduced at trial that the Mother acted contrary to the child's best interests. The [c]ourt was unable to ascertain whether it was destroying a necessary and beneficial relationship between Mother and child, as there is simply not enough evidence upon which that evaluation could be made.

Mother's Brief at 18 (citation to record omitted) (emphasis in original).

Upon review, the record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of Child's needs and welfare, and as to the lack of a bond between Mother and Child such that, if severed, would not have a detrimental impact on her. We discern no abuse of discretion, and for the reasons set forth by the trial court, termination of Mother's parental rights pursuant to Section 2511(b) was proper.

While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights.

In re Z.P., 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." Id. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/13/2017